# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
Assigned on Briefs December 7, 2011

## RALPH PAUL MARCRUM v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Davidson County**
**No. 2007-C-2264      Cheryl Blackburn, Judge**

**No. M2011-00218-CCA-R3-PC - Filed July 3, 2012**

The Petitioner, Ralph Paul Marcrum,[1] appeals as of right from the Davidson County Criminal Court's denial of his petition for post-conviction relief challenging his guilty plea to one count of aggravated burglary. The Petitioner contends that his guilty plea was not knowingly and voluntarily entered because he received ineffective assistance from his trial counsel. Following our review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed.**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which THOMAS T. WOODALL and ROBERT W. WEDEMEYER, JJ., joined.

James O. Martin, III, Nashville, Tennessee (on appeal); and Kristen Vanderkooi, Nashville, Tennessee (at post-conviction hearing), for the appellant, Ralph Paul Marcrum.

Robert E. Cooper, Jr., Attorney General and Reporter; Meredith DeVault, Senior Counsel; Victor S. Johnson, District Attorney General; and Bret Thomas Gunn, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

In 2007, the Petitioner was indicted for one count of aggravated burglary, a Class C felony, and one count of theft of property valued at $1,000 or more but less than $10,000, a Class D felony. See Tenn. Code Ann. §§ 39-14-103, -105(3), -403. On February 11, 2008, the Petitioner's case was scheduled for a jury trial. On that day, however, the Petitioner

---

[1]The Petitioner is referred to as Ralph Paul Marcrum, Ralph Paul Marcrum, Jr., Ralph P. Marcrum, and Ralph Marcrum in the record. This court will refer to the Petitioner by the name listed on his original petition for post-conviction relief.

entered into a plea agreement with the State. The Petitioner agreed to plead guilty to the aggravated burglary charge and receive a 15-year sentence as a Range III, persistent offender. The State agreed to dismiss the theft of property charge.

The trial court held a plea submission hearing during which it explained to the Petitioner his rights. The Petitioner stated under oath that he understood his rights and that he was not "having any trouble understanding what [he was] doing." The trial court explained to the Petitioner the charges and possible penalties he faced. The trial court also explained that if convicted of both charges, the Petitioner "could have gotten consecutive sentences," for an effective 27-year sentence. The Petitioner stated that he understood this. The Petitioner also stated that he understood the plea agreement, that he had "thoroughly discussed" his case with trial counsel, that trial counsel had reviewed the plea agreement with him, and that he was satisfied with trial counsel's representation.

At the plea submission hearing, the State presented the following factual basis for the Petitioner's plea. On May 23, 2007, Sandra Moses called the police after observing the Petitioner and a co-defendant break into her neighbor's home. Officers of the Metropolitan Nashville Police Department arrived on the scene and observed the co-defendant placing "a wrapped blanket into the trunk of a Dodge Intrepid." One of the officers went into the yard of the victim's home and saw the Petitioner "coming from behind the victim's house with a shovel in his hands." When the Petitioner was patted down, "two prescription bottles [belonging to] the victim were found on the [Petitioner's] person." The back door of the victim's house "appeared to have been broken open or pried open in order to get into the residence." The officers found "stolen items" wrapped in the blanket placed into the Dodge Intrepid by the co-defendant. The Petitioner stated under oath that he had heard the facts as stated by the prosecutor and that they were "generally true." The trial court accepted the Petitioner's plea and sentenced him to 15 years with a release eligibility of 45 percent.

On February 3, 2008, the Petitioner filed his original, pro se petition for post-conviction relief. The Petitioner checked "[d]enial of effective assistance of counsel" and "[n]ewly discovered evidence" on the form as grounds for post-conviction relief. However, the Petitioner failed to include a factual basis for his allegations. On February 20, 2008, the post-conviction court issued an order that the Petitioner supplement his petition with a factual basis for his claims within 15 days. On March 11, 2008, the Petitioner filed an amended petition which added that his "guilty plea [was] involuntarily entered without understanding of the nature and consequences of the plea" as an additional ground for post-conviction relief. The Petitioner asserted various alleged errors by trial counsel in his preparation for trial and plea negotiations as the factual basis for the post-conviction petition. The post-conviction court concluded that the Petitioner's amended petition "may" have presented a colorable claim and appointed counsel. On December 22, 2009, the Petitioner's counsel filed

a second amended petition for post-conviction relief reiterating the claims made in his pro se petitions. The post-conviction court held an evidentiary hearing on March 3, 2010.

At the post-conviction hearing, the Petitioner testified that prior to his preliminary hearing the State had offered him "[s]ix years at [30] percent." The Petitioner testified that he initially rejected the offer because he had been told by his ex-girlfriend that Ms. Moses, who was his ex-girlfriend's aunt, "had made a mistake and wasn't coming to court to testify against [him]." However, trial counsel informed the Petitioner that Ms. Moses was present and ready to testify against him. According to the Petitioner, trial counsel advised him that he needed "to go ahead and get on [the] record her testimony" so he would have "something to prepare [his] defense around." The Petitioner testified that based upon trial counsel's advise he declined the offer and went through with the preliminary hearing, but he "was under the assumption that [he] still had the opportunity to take the six-year sentence after [the] hearing."

Following the preliminary hearing, the Petitioner "received an offer of [13] years at [45] percent." The Petitioner testified that he rejected this offer because he thought that his "case was strong" and "that was an excessive amount of time to give [him] for something [he] didn't do." The Petitioner further testified that at the time he rejected the 13-year offer, he "was super confused and didn't have anybody at all to confide in or to speak with to get anything straightened out." According to the Petitioner, the State offered him a 10-year sentence shortly after he rejected the 13-year offer. The Petitioner testified that at some point, he "decided that it probably would be in [his] best interest just to take the ten-year sentence that was offered to [him]." However, the Petitioner's arrest in this matter constituted a violation of the terms of his probation for a federal sentence. The Petitioner explained that he did not want to accept the State's ten-year offer until his Federal Public Defender found out if he could serve his sentence for the federal probation violation concurrently with his sentence in this case.

The Petitioner testified that "within the month before" his trial date, his Federal Public Defender informed him that he could serve his sentence for the federal probation violation concurrently with his sentence in this case. On the day his case was scheduled to be tried, the Petitioner told trial counsel that he wanted to accept the State's offer of ten years. The Petitioner testified that his trial counsel told him "that the District Attorney decided that the ten years was off the table because [he] dillydallied or something to that effect." The Petitioner further testified that he felt trial counsel "lost" the ten-year offer for him. The Petitioner explained that "two or three times" before his trial date he told trial counsel that he was "more likely going to take this ten," but he was "trying to get the feds on page with it" so he would not "have to do an exorbitant amount of time." The Petitioner testified that

he thought trial counsel "was supposed to speak to the District Attorney and let him know [he] wasn't just dragging [his] feet to be complicated."

The Petitioner also testified that when he accepted the plea agreement he was under the impression that the maximum sentence he faced at trial was 21 years, 15 years for the aggravated burglary and 6 years for the theft of property. The Petitioner further testified that he would not "have pled to [15] years as a Range [III] offender . . . if [he] knew that [15 years] was the maximum [he] might get at trial." However, the Petitioner failed to explain why he now thought that he would have only faced a maximum sentence of 15 years had he gone to trial. Upon further questioning by the post-conviction court, the Petitioner admitted that the plea agreement form he read and signed clearly stated that he faced a maximum 27-year sentence if he was convicted of both charges. The Petitioner insisted that trial counsel had told him he faced a maximum 21-year sentence and that "[e]vidently [he] didn't read [the plea agreement] too closely."

With regards to the theft charge, the Petitioner noted that he "saw two listings" of stolen items. One list placed the value of the stolen items under $1,000. The other list also included "a $250 price of a damaged door" which increased the total value over $1,000. The Petitioner testified that it was his understanding that the door "was damaged [during] the breaking and entering part of the burglary." However, the Petitioner testified that he "never actually saw just up close really how the door was damaged." The Petitioner and his post-conviction counsel mistakenly believed the theft charge would only be "a felony with the addition of the monetary value of the door that was broken." However, theft of property valued at greater than $500 but less than $1,000 is a Class E felony. See Tenn. Code Ann. § 40-14-105(2). On cross-examination, the Petitioner stated that he did not know that he faced a maximum six-year sentence if convicted of theft of property valued at greater than $500 but less than $1,000.

The Petitioner also alleged that trial counsel did not properly prepare for trial and was not ready to proceed on February 11, 2008. At the evidentiary hearing, the Petitioner focused on the fact that trial counsel failed to get a photograph showing the view from the kitchen window of the house next to the victim's home. The Petitioner explained that Ms. Moses told the police officers that she had been washing dishes in the kitchen when she saw the Petitioner and his co-defendant break in through the the victim's back door. However, the Petitioner testified that he was familiar with the house Ms. Moses was in because it was his ex-girlfriend's grandmother's house, and he "was almost certain . . . there was not a vantage to see that back door from that window." The Petitioner also noted that Ms. Moses testified during the preliminary hearing that she saw the Petitioner place the stolen goods into the car instead of the co-defendant, as described in the police report. The Petitioner testified that he thought Ms. Moses was "fabricating her story" based upon this contradiction with the police

report and his belief about the view from the kitchen window. The Petitioner testified that he "begged and pleaded" with trial counsel for a photograph showing the view from the window Ms. Moses testified she was standing at, but he felt trial counsel did not make "any efforts [] to have this photo taken because it was never taken." The Petitioner did not introduce any photographs or witnesses to describe the view from the window at issue during the post-conviction hearing.

The Petitioner testified that he sent repeated letters to the District Public Defender and the Board of Professional Responsibility requesting to have a different attorney appointed to his case. The Petitioner explained that he did not like trial counsel because trial counsel constantly pushed "the plea bargain instead of . . . showing any type of belief in [him] and wanting to really investigate this and do this and do [that] and get to the bottom of the whole thing." The Petitioner specifically complained that he "never received" a copy of the preliminary hearing transcript from trial counsel. However, upon questioning by the post-conviction court the Petitioner admitted that he had received a copy of the preliminary hearing transcript before his scheduled trial date. The Petitioner argued that this was ineffective because he wanted more time to review the transcript and felt he was not ready for trial. The Petitioner also testified that he believed trial counsel had not interviewed his ex-girlfriend who he thought "might exonerate [him] from the charges." The Petitioner further testified that he thought trial counsel "had not fully reviewed the police witness reports that would have provided the leverage . . . for a lower plea bargain." Based upon the foregoing, the Petitioner concluded that trial counsel was not ready for trial on February 11, 2008.

On cross-examination, the Petitioner stated that he told the trial court at the plea submission hearing that he was satisfied with trial counsel's performance because he was "really confused," "in shock," and did not "know what to do." The Petitioner explained that despite the fact that he had approximately 20 felony convictions, he was confused at the plea submission hearing because it had "been a long time since [he had] taken a plea bargain in [s]tate [c]ourt." The Petitioner further elaborated that he actually did not remember being asked if he was satisfied with trial counsel's performance because there were "blanks" in his memory due to the fact that he "was stunned" and "was in a zone" at the plea submission hearing. The Petitioner claimed on cross-examination that trial counsel never advised him that the State could retract a plea agreement offer at any time. However, the Petitioner admitted that he made the ultimate decision every time he decided to reject or accept an offer.

Upon further questioning by the post-conviction court, the Petitioner stated that he needed a photograph of the view from the window Ms. Moses claimed to have seen him from in order to "prove that she fabricated her story." When asked by the post-conviction court why the fact that Ms. Moses fabricated her story would matter when the Petitioner was found

in the victim's backyard with prescription drugs belonging to the victim, the Petitioner stated that he planned on testifying at trial "to explain how those pills got in [his] pocket," despite the fact that he had approximately 20 prior felony convictions. The Petitioner also admitted to the post-conviction court that he was aware trial counsel had "requested a transportation order" for his ex-girlfriend to testify at trial. Despite the fact that trial counsel had his investigator interview the Petitioner's ex-girlfriend and had her present to testify at trial, the Petitioner complained that trial counsel was not ready for trial because he had requested that she be interviewed "like way, way, way earlier than that."

Trial counsel testified that he was licensed to practice law in 1976 and that he was currently employed by the District Public Defender's office in Davidson County. Trial counsel presented "a little summary of the history of the plea negotiations in this case" to the post-conviction court. According to trial counsel, the State's first offer was made prior to the preliminary hearing and was for six years. That offer was "conditional upon acceptance by the co-defendant." Trial counsel testified that he could not remember why the six-year offer fell through. However, trial counsel noted that at the time the offer was made the prosecutor thought the Petitioner only had 15 prior felony convictions. Trial counsel testified that he was sure that the State would have rescinded the six-year offer once it learned that the Petitioner actually had approximately 20 felony convictions.

According to trial counsel's summary of the negotiations, the State then offered the Petitioner a 13-year sentence. The Petitioner rejected that offer and presented a counter-offer of eight years. The State presented an offer of ten years to the Petitioner, and the Petitioner refused to accept anything over eight years. The Petitioner rejected the State's ten-year offer at least three times prior to his scheduled trial date. The Friday before his scheduled trial date, the Petitioner made an offer of 12 years, which the State refused. Since the Petitioner had made an offer of 12 years days before the scheduled trial date, trial counsel testified that he did not think the Petitioner expected the 10-year offer to "be on the table" on February 11, 2008. Trial counsel testified that it was "customary" for the State to withdraw any offers made once the case was set for trial. Trial counsel admitted that he did not "specifically recall" informing the Petitioner about that fact, but trial counsel "normally" informed his clients about the State's ability to withdraw offers. Trial counsel recalled that the prosecutor kept the ten-year offer "on the table," but the prosecutor "became annoyed" by the Petitioner repeatedly declining that offer.

According to trial counsel, the Petitioner continued to reject the State's offer of ten years because the Petitioner "wanted to resolve both state charges and federal charges in some way that was favorable to him," but they had "a great deal of difficulty in doing that." Trial counsel testified that he felt that he was prepared for trial on February 11, 2008. However, on the day the case was scheduled for trial, the State made an offer of 15 years.

Trial counsel testified that another case was going to be "taken up" that day so the prosecutor indicated that the Petitioner "could plead on that date to his offer of [15] years or the trial would begin three weeks later on March 3." Trial counsel stated that the Petitioner accepted the offer because he "had some commitments to deal with federal concurrent sentencing with the federal authorities." Trial counsel testified that the Petitioner seemed "knowledgeable about the [guilty plea] process." Trial counsel also testified that he felt that "the decision that [the Petitioner] made that day was his decision and that was a decision that he made knowing all of the consequences and all of the information that he could possibly know."

With regards to the photograph the Petitioner wanted to be used to impeach Ms. Moses, trial counsel testified that he had his investigator take photographs of the victim's house and the house Ms. Moses was in. These photographs showed where the kitchen window was located in relation to the victim's house. Trial counsel testified that he thought these photographs gave "a fairly good perspective" on what could be seen from the window and that he had color copies made of the photographs to be used as exhibits at trial. However, trial counsel did not attempt to have a photograph taken from the kitchen window because the owners had posted "no trespassing" signs on the property and the family that owned the house was "hostile with [the Petitioner]." While trial counsel thought that a photograph taken from the kitchen window "would have been helpful perhaps in impeaching the testimony of [Ms. Moses]," he did not think "it would have been dispositive of the issue" because the Petitioner was found by police in the victim's backyard with prescription drugs belonging to the victim on his person. According to trial counsel, the Petitioner planned to testify at trial to explain that "he had picked [the victim's prescription] up off the driveway, recognized it as being prescription medication, [and] knowing it shouldn't have been laying on the driveway," he took the pills because it was "a public safety hazard."

On December 20, 2010, the post-conviction court issued a detailed order denying the Petitioner post-conviction relief. The post-conviction court accredited trial counsel's testimony over the Petitioner's testimony. The post-conviction court concluded that the Petitioner failed to establish by clear and convincing evidence that his guilty plea was not knowingly and voluntarily entered. The post-conviction court noted that "the guilty plea transcript belies [the] Petitioner's claims" because the Petitioner stated under oath that he had thoroughly discussed his case with trial counsel and that he was satisfied with trial counsel's performance. The post-conviction court also concluded that trial counsel was not ineffective during the plea negotiation process. The post-conviction court noted that the Petitioner's primary goal during the negotiation process was to ensure that his federal and state sentence could be served concurrently. The post-conviction court concluded that because "this desired result was achieved," the Petitioner had not "established [that] he [had] suffered any prejudice."

With regards to the Petitioner's claims that trial counsel was not prepared for trial, the post-conviction court stated that the Petitioner failed "to introduce any photographs" or "any witnesses [to] testify about the vantage point of the window at issue." The post-conviction court further stated that it would not speculate on what the evidence might have shown and concluded that the Petitioner failed to establish prejudice by clear and convincing evidence on this issue. As for the Petitioner's claims regarding his ex-girlfriend, the post-conviction court concluded that this issue was without merit because trial counsel had subpoenaed the Petitioner's ex-girlfriend to testify at trial. Based upon the foregoing, the post-conviction court concluded that the Petitioner failed to show that trial counsel's actions forced him to involuntarily enter his guilty plea.

ANALYSIS

The Petitioner contends that his guilty plea was not knowingly and voluntarily entered due to the ineffective assistance of his trial counsel. On appeal, the Petitioner argues that "due to trial counsel's failure to adequately prepare a defense, [the Petitioner] felt he had no choice but to plead guilty on the morning of trial rather than risk a greater sentence." The Petitioner's argument in his brief centers on trial counsel's failure to obtain a photograph depicting the view from the window Ms. Moses claimed to have been looking out. The Petitioner concludes that but for trial counsel's alleged deficient performance, he would not have pled guilty. The State responds that the Petitioner failed to establish by clear and convincing evidence that his guilty plea was involuntarily and unknowingly entered or that he suffered any prejudice by trial counsel's actions.

The burden in a post-conviction proceeding is on the petitioner to prove his allegations of fact supporting his grounds for relief by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f); see Dellinger v. State, 279 S.W.3d 282, 293-94 (Tenn. 2009). On appeal, we are bound by the trial court's findings of fact unless we conclude that the evidence in the record preponderates against those findings. Fields v. State, 40 S.W.3d 450, 456 (Tenn. 2001). Because they relate to mixed questions of law and fact, we review the post-conviction court's conclusions as to whether counsel's performance was deficient and whether that deficiency was prejudicial under a de novo standard with no presumption of correctness. Id. at 457.

Under the Sixth Amendment to the United States Constitution, when a claim of ineffective assistance of counsel is made, the burden is on the petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial. Strickland v. Washington, 466 U.S. 668, 687 (1984); see Lockhart v. Fretwell, 506 U.S. 364, 368-72 (1993). In other words, a showing that counsel's performance falls below a reasonable standard is not enough; rather, the petitioner must also show that but for the substandard

performance, "the result of the proceeding would have been different." Strickland, 466 U.S. at 694. The Strickland standard has been applied to the right to counsel under article I, section 9 of the Tennessee Constitution. State v. Melson, 772 S.W.2d 417, 419 n.2 (Tenn. 1989). In the context of a guilty plea, like the present case, the effective assistance of counsel is relevant only to the extent that it affects the voluntariness of the plea. Therefore, to satisfy the second prong of Strickland, the petitioner must show that "there is a reasonable probability that, but for counsel's errors, he would not have [pled] guilty and would have insisted on going to trial." Hill v. Lockhart, 474 U.S. 52, 59 (1985); see also Walton v. State, 966 S.W.2d 54, 55 (Tenn. Crim. App. 1997).

There is no evidence in the record to suggest that trial counsel was ineffective in his representation of the Petitioner. Trial counsel testified that he was prepared for trial, that he had photographs of the victim's and neighbor's houses to use in an attempt to impeach Ms. Moses's testimony, and that he had subpoenaed the Petitioner's ex-girlfriend to testify at trial. To the extent that the Petitioner complained that trial counsel failed to interview or properly prepare for his ex-girlfriend's testimony, the Petitioner failed to present her testimony at the post-conviction hearing, thereby waiving the issue. See Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). Likewise, the Petitioner failed to present any evidence or witnesses, besides himself, that would establish that Ms. Moses could not see the victim's back door from the kitchen window of the house she was in. Trial counsel explained that he was not able to obtain such a photograph because the owners of the house were hostile towards the Petitioner and had posted "no trespassing" signs. Furthermore, the Petitioner was discovered by the police coming from the victim's backyard with a shovel and prescription drugs belonging to the victim on his person. As such, we conclude that trial counsel's actions did not amount to ineffective assistance of counsel.

The Petitioner admitted that he made every decision to decline or accept the State's plea agreement offers. The Petitioner repeatedly refused the State's offer of ten years in order to ensure that his sentence for the federal probation violation could run concurrently to his sentence in this case. Trial counsel's testimony and his notes belie the Petitioner's assertion that on February 11, 2008, he told the State that he was prepared to accept the ten-year offer. Instead, the Petitioner had made an offer to the State for a 12-year sentence only a few days earlier. Furthermore, the Petitioner informed the trial court at the plea submission hearing that he was voluntarily pleading guilty, that he had reviewed the plea agreement with trial counsel, and that he was satisfied with trial counsel's performance. Accordingly, we conclude that the Petitioner failed to establish by clear and convincing evidence that his guilty plea was not knowingly and voluntarily entered.

CONCLUSION

Upon consideration of the foregoing and the record as a whole, the judgment of the post-conviction court is affirmed.

_____
D. KELLY THOMAS, JR., JUDGE